**UNITED STATES of America,
Appellant,**

v.

**Richard COPELAND, also known
as Jamal Owen, Defendant–
Appellee,**

Docket No. 02–1704.

United States Court of Appeals,
Second Circuit.

Argued: Aug. 28, 2003.

Decided: July 16, 2004.

Steven H. Breslow, Assistant United States Attorney (Roslynn R. Mauskopf, United States Attorney and Emily Berger, Assistant United States Attorney, on the brief), Brooklyn, New York, for Appellant.

David A. Lewis (Leonard F. Joy and Michael P. Padden, on the brief, Barry Leiwant, current counsel), The Legal Aid Society Federal Defender Division, New York, New York, for Defendant–Appellee.

Before: WINTER, CALABRESI, and KATZMANN, Circuit Judges.

WINTER, Circuit Judge.

The government appeals from Judge Weinstein's dismissal of an indictment charging Richard Copeland with illegal reentry into the United States after deportation. *See* 8 U.S.C. § 1326(a). Copeland collaterally attacked the validity of his deportation order as provided under Section 1326(d), and the district court held that his deportation was not a valid element of the criminal reentry charge because the underlying deportation hearing was not consistent with due process. We agree that most of the requirements of Section 1326(d) have been met. However, we remand for a hearing and findings on whether the defects in Copeland's deportation hearing caused him prejudice.

## BACKGROUND

a) *Copeland's History*

Copeland, a Jamaican citizen, had been adopted by his grandmother, a naturalized citizen of the United States, in 1978. He came to the United States at age 12 in 1982 and lived in this country as a lawful permanent alien until he was deported in 1998. The district court found that at the time of his deportation, Copeland was living with and supporting his two children, ages 11 and 4, and their mother, all of whom are citizens of the United States.

Copeland was convicted of four New York state crimes prior to his deportation. Upon each arrest, he gave the police false names, social security numbers, addresses, and/or birth dates. On May 18, 1988, he

was arrested for grand larceny of a car, criminal possession of stolen property, and unauthorized use of a vehicle. Based on this arrest, Copeland ultimately pled guilty to disorderly conduct and was sentenced to three days in prison. On March 22, 1989, Copeland was arrested and charged with criminal possession of a controlled substance in the second degree and criminal possession of a weapon in the third degree. Copeland failed to appear on the date set by the court, and a bench warrant for his arrest was issued. While the warrant in the weapons case was still out, Copeland was arrested under an alias on February 9, 1993, for attempted criminal sale of a controlled substance—crack cocaine—in the third degree. Still under the alias, Copeland pled guilty to this charge and was sentenced to a year in prison but apparently did not begin to serve his sentence.[1]

The warrant on the weapons charge was returned after yet another arrest on September 18, 1995. At that time Copeland pled guilty under his own name to criminal possession of a weapon in the third degree for the 1989 arrest and was sentenced to a year in prison on that charge. The conduct leading to Copeland's September 16, 1995 arrest involved serious violence. He pulled a man from a car at gunpoint, demanded money, and shot him in the throat when the man tried to escape. The victim was paralyzed by the shot. Copeland was charged with attempted murder, first degree robbery, first and fourth degree assault, criminal possession of a weapon in the second and third degrees, and menacing in the second degree. On October 27, 1995, Copeland pled guilty to criminal possession of a weapon in the second degree based on these charges and was sentenced

to an 18 to 54 month term of imprisonment. Copeland served his three felony sentences concurrently, from October 13, 1995 to September 23, 1998.

b) *The Deportation*

While Copeland was incarcerated on his various sentences, the INS initiated deportation proceedings based on his conviction of the February 9, 1993 attempted criminal sale of a controlled substance. 8 U.S.C. § 1227(a)(2)(B)(i) and (a)(2)(A)(iii). A deportation hearing was held before an Immigration Judge ("IJ") on August 7 and November 27, 1996. At the August hearing, the IJ began by informing Copeland of his right to an attorney and to appeal any decision by the IJ within 30 days of that decision. The IJ also told Copeland that because he was an alien, he would be deportable if the INS proved that he had been convicted of attempted sale of a controlled substance. The IJ stated that "[u]nder current law there is no waiver for deportability if you're, had been convicted of, of violation of a controlled substance law," because "the law changed April 1996 a couple a months ago ... and the new law says if you have a conviction for narcotics you're not eligible for any form of relief."

Copeland seemingly tried to ask whether the date of his conviction affected his eligibility for waiver:

> COPELAND: So, so that law it, it all depends umm ... if it was before April 19...
>
> JUDGE: It doesn't depend upon when the crime was com...
>
> COPELAND: Oh?
>
> JUDGE: No! No! Goes by whether ... if you have ...

---

1.  Copeland pled guilty to the crack cocaine charge on September 27, 1993 under an alias. Copeland, the INS, and the IJ seemingly believed that a formal conviction was entered

on that date. However, it appears that Copeland was not formally convicted on that charge until October 16, 1995, that is, until after his 1995 arrest.

COPELAND: ... (unintelligible) ... what's in your record.

JUDGE: Right. Alright, that's what the law says now. As if and it says that. Okay? But speak to lawyers about it ....

The IJ then adjourned the hearing for three months to give Copeland time to find an attorney.

When the hearing resumed on November 27, 1996, Copeland appeared *pro se.* Copeland admitted that he was not a citizen of the United States, that he was a citizen of Jamaica, and that he had been convicted of attempted criminal sale of a controlled substance on September 27, 1993.[2] The IJ found Copeland "deportable from the United States as charged." The following colloquy then occurred:

JUDGE: There's no relief available to you anymore because the law changed in April. And the new law said that if you have a conviction for a controlled substances [sic] you're deportable and there's no relief. So I feel I have no alternative but to order you deported to Jamaica. You could accept this decision as a final decision or you can appeal my decision. Which would you prefer to do?

COPELAND: I will accept this decision.

Copeland did not file an appeal with the Board of Immigration Appeals ("BIA") within the 30 day time limit for such filings. Copeland remained in the United States, however, because of his incarceration in New York.

The "new law" referred to by the IJ was actually two laws: the Antiterrorism and Effective Death Penalty Act of 1996, ("AEDPA"), Pub.L. No. 104–132, 110 Stat.

1214, enacted on April 24, 1996, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009–546, enacted on September 30, 1996 (collectively, "the 1996 Amendments"), which amended the Immigration and Nationality Act ("INA"), 66 Stat. 163, as amended, 8 U.S.C. § 1101 *et seq.* Prior to these amendments, the Attorney General had broad discretion to cancel deportation orders for aliens who met certain residence requirements and had not served five years in prison for an aggravated felony. *See* 8 U.S.C. § 1182(c) (repealed 1996); *INS v. St. Cyr,* 533 U.S. 289, 296–97, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). AEDPA amended Section 1182(c) to render aliens who pled guilty to aggravated felonies ineligible for Section 212(c) discretionary relief from deportation. AEDPA § 440(d). IIRIRA then repealed § 212(c), *see* IIRIRA § 304(b), replacing it with a new section giving the Attorney General authority to cancel removal for only a narrowly defined class of inadmissible or deportable aliens, not including anyone "convicted of any aggravated felony," *id.* (creating 8 U.S.C. § 1229b). At the time of Copeland's deportation hearing, the BIA's position was that the 1996 Amendments applied retroactively to aliens, like Copeland, who had pled guilty to aggravated felonies prior to their enactment. *See In re Soriano,* 21 I. & N. Dec. 516, 534, 1996 WL 426888 (BIA June 27, 1996), *vacated on other grounds,* 1997 WL 33347804 (Op. Atty Gen. Feb. 21, 1997). The IJ's statement to Copeland that new laws had rendered him ineligible for relief was based on *Soriano.*

During 1997 and 1998, however, several courts in this circuit and elsewhere ruled

---

**2.** It appears that Copeland pled guilty on September 27, 1993, but was not convicted until October 16, 1995. *See* note 1, *supra.* Because neither party discusses this discrepan-

cy, the record is somewhat unclear. In any event, the precise date of conviction appears not to be material to the issues before us, and we do not resolve the discrepancy.

that Section 440(d) could not be applied retroactively in Copeland's circumstances. *See, e.g., Goncalves v. Reno*, 144 F.3d 110, 133 (1st Cir.1998); *Mojica v. Reno*, 970 F.Supp. 130, 182 (E.D.N.Y.1997). The Supreme Court eventually agreed, holding that Section 440(d) could not be applied retroactively to aliens who pled guilty to crimes prior to 1996 that made them ineligible for Section 212(c) relief under the 1996 Amendments. *St. Cyr*, 533 U.S. at 326, 121 S.Ct. 2271.

On September 22, 1998, after his deportation hearing but prior to the decision in *St. Cyr*, Copeland filed a motion to reopen his deportation proceedings and for a stay of deportation under Section 212(c). Copeland, now represented by counsel, based his motion in part on the argument that the IJ had breached his obligation under 8 C.F.R. § 242.17(a) to inform Copeland of his eligibility for Section 212(c) relief. The same IJ denied Copeland's motion to reopen on the ground that, although Section 212(c) relief remained available to aliens whose deportation proceedings began prior to the passage of AEDPA, Copeland was ineligible for Section 212(c) relief because his deportation proceedings began after its passage.

Copeland appealed the IJ's decision to the BIA on October 6, 1998, arguing that he was eligible for Section 212(c) relief. However, on November 24, 1998, before the BIA considered his appeal, Copeland was deported to Jamaica. On May 25, 1999, the BIA dismissed Copeland's appeal as moot under 8 C.F.R. § 3.6(b) because Copeland had already been deported.

c) *District Court Decision*

Copeland reentered this country by February 22, 1999, at the latest. On December 1, 2001, he was arrested and thereafter indicted in the Eastern District of New York for illegal reentry into the United States. 8 U.S.C. §§ 1326(a),(b)(2); 18 U.S.C. § 3551 *et seq.* On March 27, 2002, Copeland moved to dismiss the indictment on the grounds that his deportation order, an element of the crime of illegal reentry, was invalid.

At a hearing before Judge Weinstein, Copeland argued that he was not accurately advised of his right to appeal because the IJ incorrectly told him that no relief was available because of the 1996 Amendments. The district court scheduled another hearing to determine whether Copeland "really didn't appreciate that he had a right to appeal[,] having been overborne" by the IJ. At that hearing, the court listened to the tapes of Copeland's deportation hearings, heard testimony from an INS agent on Copeland's criminal history, and asked Copeland about his age (27) and education (high school equivalency) at the time of his deportation hearing. The district court found that Copeland's "will was not overborne" and that he made "a rational decision [not to appeal]—based upon the advice he then received, which ultimately turned out to be incorrect." The court also found that the IJ effectively told Copeland that appeal would be futile, and Copeland rationally "decided not to waste his time and the government's time by appealing."

The district court then dismissed the indictment on the ground that the underlying deportation order violated Copeland's due process rights and therefore could not be the basis for the prior deportation element in the illegal reentry charge. *United States v. Copeland*, 228 F.Supp.2d 267, 272 (E.D.N.Y.2002).

The district court noted that, under Section 1326(d), a deportation order could be collaterally challenged in an illegal reentry criminal case if the alien 1) exhausted administrative remedies; 2) was deprived of the opportunity for judicial review; and 3)

showed that the proceeding was fundamentally unfair. *Id.* at 270 (citing 8 U.S.C. § 1326(d)). According to the court, Copeland satisfied the exhaustion requirement because, though he did not appeal to the BIA, "any attempt to do so would have been futile" given the then-current BIA interpretation of AEDPA. *Id.* at 271. Copeland was deemed by the court to have been denied judicial review because the applicable transitional rules of IIRIRA barred direct judicial review of deportation orders against aliens deported for narcotics offenses. *Id.* Finally, Copeland's deportation order was found to be "fundamentally unfair" because the IJ "not only failed to advise the defendant of the existence of discretionary relief, but affirmatively misled him by indicating he was ineligible for such relief." *Id.* at 271–72. This unfairness was deemed prejudicial to Copeland because there was a "reasonable likelihood" that he would have been granted Section 212(c) relief. *Id.* at 272. Because the requirements of Section 1326(d) had been satisfied, the court dismissed the indictment.

This appeal by the government followed.

### DISCUSSION

The adjudicative facts are not in dispute, and we review the issues of law *de novo*. *Elewski v. City of Syracuse*, 123 F.3d 51, 53 (2d Cir.1997).

a) *Collateral Attack on Deportation Orders* It is a crime for a deported or removed alien to enter, attempt to enter, or be found in the United States. 8 U.S.C. § 1326(a). An alien can defend against such a charge by challenging the validity of the deportation order upon which the charge is predicated. In *United States v.*

*Mendoza–Lopez*, the Supreme Court held that "where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding." 481 U.S. 828, 837–38, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987) (emphasis in original). In response to *Mendoza–Lopez*, Congress added a subsection to Section 1326 providing:

> (d) In a criminal proceeding [for illegal reentry], an alien may not challenge the validity of the deportation order . . . unless the alien demonstrates that—
>
> (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;
>
> (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and
>
> (3) the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d). We turn to the application of Section 1326(d)(1),(2), and (3) in the present matter.

1. Section 1326(d)(1): Exhaustion of Administrative Remedies

The district court held that Copeland had fulfilled the exhaustion requirement of Section 1326(d)(1) because an appeal to the BIA would have been futile in light of *Soriano*. However, we have since held that there is no futility exception, with one qualification described below, to statutory exhaustion requirements.[3] *Theodoropoulos v. INS*, 358 F.3d 162, 172 (2d Cir.2004) (superseding opinion); *Beharry v. Ashcroft*, 329 F.3d 51, 58 (2d Cir.2003); *see also Booth v. Churner*, 532 U.S. 731, 741 n. 6, 121 S.Ct. 1819, 149 L.Ed.2d 958

---

**3.** In ruling to the contrary, the district court relied upon *Sousa v. INS.* 226 F.3d 28 (1st Cir.2000). However, *Sousa* stated that it was

"unnecessary . . . to decide" in that case whether a futility exception existed. *Id.* at 32.

(2001) ("we will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise"). Statutory exhaustion requirements such as Section 1326(d)(1) are "mandatory, and courts are not free to dispense with them." *United States v. Gonzalez–Roque,* 301 F.3d 39, 47 (2d Cir. 2002) (internal quotation marks omitted). The qualification to this rule is that futility excuses a litigant from a statutory exhaustion requirement "where the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint." *Booth,* 532 U.S. at 736, 121 S.Ct. 1819. In such cases, "[w]ithout the possibility of some relief, the administrative officers would presumably have no authority to act on the subject of the complaint, leaving the [complainant] with nothing to exhaust." *Id.* at 736 n. 4, 121 S.Ct. 1819 (*quoted in Theodoropoulos,* 358 F.3d at 173). This qualification is not helpful to Copeland because the BIA had authority to overrule the IJ's ruling that the 1996 Amendments applied retroactively to him. *See Theodoropoulos,* 358 F.3d at 173 (exhaustion not excused in habeas context because "the BIA could have overruled the IJ's construction of IIRIRA's repeal of § 212(c) as applying retrospectively").

Nevertheless, under our caselaw, Copeland's motion to reopen his deportation hearing and his appeal from the denial of that motion satisfied the exhaustion requirement of Section 1326(d). In *United States v. Perez,* we held that an alien who failed to appeal an IJ's deportation order satisfied the exhaustion requirement of Section 1326(d) by making a motion to reopen his case and appealing the denial of that motion to the BIA. 330 F.3d 97, 101 (2d Cir.2003).[4] Appeal of a denial of a motion to reopen to the BIA fulfills the purposes of the exhaustion requirement because, in such a proceeding, the BIA can correct any errors and allow the alien to supplement the record with more evidence. *Id.* (citing *Gonzalez–Roque,* 301 F.3d at 48).[5]

2. Section 1326(d)(2): Denial of Judicial Review

Under Section 1326(d)(2), Copeland must demonstrate that he was denied an opportunity for judicial review. An alien is denied this opportunity, for example, if the IJ does not adequately inform him of his right to a direct appeal from a deportation order. *Mendoza–Lopez,* 481 U.S. at 840. However, in the instant case, Copeland had no statutory right to appeal his deportation order directly to a federal court under AEDPA and the transitional

---

4. It is true that in *Perez* the motion to reopen was timely, 330 F.3d at 100, *see* 8 C.F.R. § 1003.23(b)(1) (motion to reopen must be filed within 90 days of date of entry of final order of removal), while Copeland's was not. However, under the rationale of *Perez,* this is not a material difference because the IJ had power to reopen Copeland's case despite the untimeliness of his motion. An IJ "may upon his or her own motion at any time, or upon motion of the Service or the alien, reopen or reconsider any case." 8 C.F.R. § 1003.23(b)(1). Moreover as noted, the IJ did in fact address Copeland's claim on the merits, ruling that he was ineligible for Section 212(c) relief because his deportation pro-

ceeding began after the passage of AEDPA. Thus, Copeland's motion to reopen and appeal of the denial of that motion served the purposes of the administrative exhaustion requirement—allowing the IJ and BIA to correct error.

5. The government suggests that Copeland's failure to pursue a habeas action buttresses its claim that he did not exhaust administrative remedies. However, Section 1326(d)(1)'s exhaustion requirement applies to exhaustion of administrative, not judicial remedies. *See Perez,* 330 F.3d at 101.

rules of IIRIRA.[6] IIRIRA § 309(c)(4)(G). Nevertheless, Copeland may have had the right to seek judicial relief by way of habeas corpus.

The availability of habeas review is sometimes deemed to constitute an opportunity for judicial review. *See Gonzalez–Roque*, 301 F.3d at 49–50 (even though IIRIRA prevented direct petition for review of deportation in federal court, alien not denied judicial review because habeas review was available). Nevertheless, the technical availability of habeas review is not always sufficient to constitute available judicial review. In *Mendoza–Lopez* itself, habeas review was apparently available to the aliens, yet the Court held that they were deprived of judicial review where direct review was available but their waivers of appeal were not considered or intelligent. *See* 481 U.S. at 836–37, 840, 107 S.Ct. 2148 (holding aliens deprived of opportunity for judicial review of deportation order but recognizing that "any alien held in custody pursuant to an order of deportation may obtain judicial review of that order in a habeas corpus proceeding").

Reading *Gonzalez–Roque* and *Mendoza–Lopez* in tandem, we hold that where habeas review is technically available, judicial review will be deemed to have been denied if resort to a habeas proceeding was not realistically possible. In both decisions, the consequences of the availability of habeas review turned on the temporal interval between the order and physical deportation during which the alien could have filed a habeas petition. In *Mendoza–Lopez*, the deportation order was issued on or after October 30, 1984, in Denver, Colorado, and the aliens were deported—after being bused to El Paso, Texas—on November 1, 1984. 481 U.S. at 830, 107 S.Ct. 2148. In contrast, in *Gonzalez–Roque*, the deportation order was finalized by the BIA's dismissal of the alien's appeal in November 1996, but Gonzalez–Roque was not deported until September 1997, about 10 months later. 301 F.3d at 44.

■ We read these precedents to indicate that where habeas review is potentially available, an opportunity for judicial review will still be deemed to have been denied where the interval between entry of the final deportation order and the physical deportation is too brief to afford a realistic possibility of filing a habeas petition. We read them further to establish a principle that where no realistic opportunity for judicial review by way of habeas review existed, an alien's failure to seek such review will not be deemed to preclude

**6.** Copeland and the government dispute whether Copeland was denied direct judicial review because his waiver of appeal to the BIA was invalid—i.e. not knowing and intelligent. Where a waiver of the right to appeal is not knowing, an alien is deprived of the opportunity for judicial review. *See United States v. Fares*, 978 F.2d 52, 56 (2d Cir.1992) ("Though an alien may waive his right to appeal, any such waiver must be considered and intelligent."); *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (effective waiver is an "intentional relinquishment or abandonment of a known right or privilege"). In *Mendoza–Lopez*, the Supreme Court stated that "[b]ecause the waivers of their rights to appeal were not considered or intelligent, respondents were deprived of judi-

cial review of their deportation proceeding." 481 U.S. at 840, 107 S.Ct. 2148. In that case, as in Copeland's, the aliens were told that they had a right to appeal. *Id.* at 845, 107 S.Ct. 2148 (Rehnquist, C.J., dissenting). Nevertheless, the aliens' waivers were not considered or intelligent because they did not understand the IJ's explanation of their right to seek discretionary relief from deportation. *Id.* at 840, 107 S.Ct. 2148. As noted *infra*, an IJ has special duties toward an alien in deportation proceedings, *see Yang v. McElroy*, 277 F.3d 158, 162 & n. 3 (2d Cir.2002), and Copeland's waiver may not have been considered or intelligent because it was based on misleading information provided by the IJ about his eligibility for discretionary relief.

a collateral attack on a deportation order under Section 1326(d)(2). In the present case, Copeland had no realistic opportunity for habeas review not only because of the lack of time but also because of the legal uncertainties as to the availability of habeas review.

Copeland's deportation order became administratively final on November 27, 1996, when the IJ ordered him deported. *See* 8 C.F.R. § 1003.39 ("Except when certified to the [BIA], the decision of the [IJ] becomes final upon waiver of appeal or upon expiration of the time to appeal if no appeal is taken, whichever occurs first.") (formerly codified at 8 C.F.R. § 3.39). After deportation, further administrative and habeas review were precluded by a pre-IIRIRA provision which applied to Copeland under the transitional rules of IIRIRA. That provision, former Section 106 of the INA, stated that "[a]n order of deportation ... shall not be reviewed by any court if the alien ... has departed the United States after the issuance of the order." 8 U.S.C. § 1105a(c) (1995). Section 106 applied to aliens subject to IIRIRA's transitional rules governing judicial review—aliens who were in deportation proceedings "as of" April 1, 1997, and in whose cases final orders of deportation were entered after October 30, 1996. IIRIRA § 309(c). Copeland met these criteria, because his final deportation order was entered on November 27, 1996. Thus, Copeland was statutorily barred from filing a habeas petition after he was deported. *See Swaby v. Ashcroft*, 357 F.3d 156, 160 n. 8 (2d Cir.2004) (noting that habeas petitions filed by aliens subject to INS Section 106 mooted by deportation); *Du-*

*ran v. Reno*, 197 F.3d 63, 63 (2d Cir.1999) (dismissing habeas petition filed by deported alien subject to INA Section 106 as moot). *Swaby* held that a habeas petition filed by an alien under IIRIRA's new judicial review provisions was not mooted by deportation because a collateral consequence of that deportation—a lifetime bar to entering the United States—was sufficient to maintain a live case or controversy. 357 F.3d at 160–61. *Swaby* did not address the issue of whether IIRIRA allows aliens to initiate habeas petitions after deportation, an entirely different issue governed by the statutory requirement that a habeas petitioner be "in custody" at the time of filing, 28 U.S.C. §§ 2254(a), 2255, rather than the constitutional case or controversy requirement. We need not reach the latter issue because Copeland was statutorily barred from filing a habeas petition after his deportation.

Copeland therefore had habeas relief available, if at all, only before his deportation on November 24, 1998. However, had Copeland sought habeas review before filing the motion to reopen with the IJ and appealing the denial of that motion, he would have faced the defense that he had not exhausted his administrative remedies because his appeal to the BIA was still pending at the time of his deportation. An alien who waives his appeal cannot seek habeas relief when the order becomes final because such relief is not available unless a petitioner "has exhausted all administrative remedies available ... as of right." 8 U.S.C. § 1252(d)(1). *See also Theodoropoulos*, 358 F.3d at 171.[7]

---

7. *Theodoropoulos* referred to the IIRIRA's permanent rules quoted *supra*, but their exhaustion requirement is substantively identical to that in the transitional rules applicable to Copeland. *See* INA § 106(c) (formerly codified at 8 U.S.C. § 1105a(c)) ("an order of

deportation or exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations").

A complexity arises because Copeland has argued that his initial failure to exhaust may have resulted from a waiver of appeal that was not knowing and intelligent. *See* note 6, *supra*. It is therefore possible, although we do not decide the question, that, if Copeland had not attempted to exhaust by pursuing a motion to reopen and had instead sought habeas review, he would have been afforded such review on the ground that his failure to exhaust administrative remedies was based on an invalid waiver of appeal to the BIA. *See Mendoza–Lopez*, 481 U.S. at 840, 107 S.Ct. 2148. There is therefore a possibility that Copeland could have succeeded in obtaining habeas review. However, the IJ's failure to give Copeland accurate information left Copeland in a dilemma. If he sought habeas review, he would have been met with the defense that he had failed to exhaust administrative remedies, although he might have prevailed. If he sought to exhaust those remedies first to ensure habeas review, he might have been deported before completion, thereby barring all remedies. Given the dilemma created by the IJ's error and the clear congressional preference for administrative exhaustion reflected in Section 1326(d)(1), we hold that Copeland's resort to administrative remedies was not unreasonable and that his opportunity for habeas review was not sufficiently realistic to bar him from challenging the validity of the deportation order.

3. Section 1326(d)(3): Fundamental Unfairness

"To show fundamental unfairness [under Section 1326(d)(3)], a defendant 'must show both a fundamental procedural error and prejudice resulting from that error.'" *Perez*, 330 F.3d at 104 (quoting *United States v. Fernandez–Antonia*, 278 F.3d 150, 159 (2d Cir.2002)). In short, "in order to demonstrate prejudice an alien must show that his proceeding contained errors so fundamental that he might have been deported in error." *Fernandez–Antonia*, 278 F.3d at 159.

We turn first to the nature of the error in Copeland's deportation hearing. There is a disagreement among the circuits over whether the failure to inform an alien of his right to seek discretionary relief can ever be a fundamental procedural error. The Fifth Circuit has stated that "[b]ecause eligibility for § 212(c) relief is not a liberty or property interest warranting due process protection, we hold that the [IJ's] error in failing to explain [the alien's] eligibility does not rise to the level of fundamental unfairness," *United States v. Lopez–Ortiz*, 313 F.3d 225, 231 (5th Cir.2002), *cert. denied*, 537 U.S. 1135, 123 S.Ct. 922, 154 L.Ed.2d 827 (2003), and the majority of circuits that have addressed the issue agree. *See United States v. Aguirre–Tello*, 353 F.3d 1199, 1205 (10th Cir.2004) (*en banc*) ("there is no constitutional right to be informed of the existence of discretionary relief for which a potential deportee might be eligible"); *Smith v. Ashcroft*, 295 F.3d 425, 430 (4th Cir.2002) (aliens have "no protected liberty or property interest in discretionary 212(c) relief" because such relief is discretionary); *Oguejiofor v. Attorney General*, 277 F.3d 1305, 1309 (11th Cir.2002) ("Under our precedent, an alien has no constitutionally-protected right to discretionary relief or to be eligible for discretionary relief."); *Escudero–Corona v. INS*, 244 F.3d 608, 615 (8th Cir.2001) ("'Eligibility for suspension is not a right protected by the Constitution. Suspension of deportation is rather an act of grace that rests in the unfettered discretion of the Attorney General.'") (quoting *Ashki v. INS*, 233 F.3d 913, 921 (6th Cir.2000) (quoting in turn *Appiah v. INS*, 202 F.3d 704, 709 (4th Cir.2000))).

Only the Ninth Circuit has held that an IJ's failure properly to inform an alien facing removal of his right to seek discretionary relief may be fundamentally unfair. *United States v. Ubaldo–Figueroa,* 364 F.3d 1042, 1049 (9th Cir.2004) ("We do not consider an alien's waiver of his right to appeal his deportation order to be 'considered and intelligent when the record contains an inference that the petitioner is eligible for relief from deportation, but the [IJ] fails to advise the alien of this possibility and give him the opportunity to develop the issue.'") (quoting *United States v. Muro–Inclan,* 249 F.3d 1180, 1182 (9th Cir.2001)) (some internal quotation marks omitted).

We believe that a failure to advise a potential deportee of a right to seek Section 212(c) relief can, if prejudicial, be fundamentally unfair within the meaning of Section 1326(d)(3). To be sure, relief under Section 212(c) is not constitutionally mandated and is discretionary. It does not follow, however, that where an alien is erroneously denied information regarding the right to seek such relief, and the erroneous denial of that information results in a deportation that likely would have been avoided if the alien was properly informed, such error is not fundamentally unfair within the meaning of Section 1326(d)(3).

An error in a ruling by a lower tribunal is generally not deemed fundamental when a remedy was available on appeal but no appeal was taken. *See Alfano v. United States,* 555 F.2d 1128, 1130 (2d Cir.1977) (explaining in the context of a habeas petition that "'nonconstitutional claims that could have been raised on appeal, but were not, may not be asserted in collateral proceedings.'") (quoting *Stone v. Powell,* 428 U.S. 465, 477 n. 10, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976)). However, a ruling by an IJ that misleads an alien into believing that no relief exists falls into a differ-

ent category because of the special duties of an IJ to aliens. "[T]he IJ . . . unlike an Article III judge, is not merely the fact finder and adjudicator but also has an obligation to establish the record." *Yang v. McElroy,* 277 F.3d 158, 162 (2d Cir. 2002); *Secaida–Rosales v. INS,* 331 F.3d 297, 306 (2d Cir.2003) ("IJ has an affirmative obligation to help establish and develop the record" in asylum proceedings involving *pro se* aliens); 8 U.S.C. § 1229a(b)(1) ("The immigration judge shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses."). We have noted that an administrative law judge has special duties in the "non-adversarial context of social security cases," and we have quoted with approval the Ninth Circuit's holding that an IJ's duty to develop the record in an adversarial immigration proceeding is "'analogous to that of an administrative law judge in [a] social security [hearing],'" especially where an alien is unrepresented by counsel. *Yang,* 277 F.3d at 162 n. 3 (quoting *Jacinto v. INS,* 208 F.3d 725, 732–33 (9th Cir.2000)). Given that IJs have a duty to develop the administrative record, and that many aliens are uncounselled, our removal system relies on IJs to explain the law accurately to *pro se* aliens. Otherwise, such aliens would have no way of knowing what information was relevant to their cases and would be practically foreclosed from making a case against removal.

The cases holding that prejudicial misinformation about Section 212(c) relief is never a fundamental procedural error rely upon a property rights analysis that is utilized most frequently in Section 1983 cases. *See, e.g., McMenemy v. City of Rochester,* 241 F.3d 279, 286 (2d Cir.2001) (explaining that to prevail on a Section 1983 claim, a plaintiff must show that he "possessed a protected liberty or property interest, and that he was deprived of that

interest without due process") (internal quotation marks omitted). In such cases, that analysis looks to whether government benefits or employment are discretionary in order to determine whether there is a due process right to pre- or post-deprivation hearings before the benefits or employment can be terminated. *See id.* at 286–87; *RR Village Ass'n, Inc. v. Denver Sewer Corp.*, 826 F.2d 1197, 1201–02 (2d Cir.1987) ("if state law makes the pertinent official action discretionary, one's interest in a favorable decision does not rise to the level of a property right entitled to procedural due process protection"). However, the right to a Section 212(c) hearing is well established and mandatory, whether or not the ultimate granting of relief is discretionary. In fact, under applicable regulations, an IJ must both inform an eligible alien of his or her right to a Section 212(c) hearing, 8 C.F.R. § 242.17(a) (removed 1998), and thereafter hold such a hearing, if requested, 8 C.F.R. § 212.3(e)(1). And we have said, "[W]hen a regulation is promulgated to protect a fundamental right derived from . . . a federal statute, and the INS fails to adhere to it, the challenged deportation proceeding is invalid . . . ." *Waldron v. INS*, 17 F.3d 511, 518 (2d Cir.1993).

Critical to our reasoning, of course, is the distinction between a right to seek relief and the right to that relief itself, although often the concepts overlap as a practical matter. The decisions holding that a failure to inform an alien about Section 212(c) relief cannot be a fundamental error collapse this distinction and incorrectly assume that, because the grant of Section 212(c) relief is itself discretionary, the denial of a Section 212(c) hearing cannot be a fundamental procedural error. *See, e.g., Lopez–Ortiz*, 313 F.3d at 231 ("denial [of Section 212(c) relief] does not implicate the Due Process clause" and therefore "eligibility for § 212(c) relief is not a liberty or property interest warranting due process protection"). However, as the Supreme Court noted in *St. Cyr,*

> Traditionally, courts recognized a distinction between eligibility for discretionary relief, on the one hand, and the favorable exercise of discretion, on the other hand. Eligibility that was "governed by specific statutory standards" provided "a right to a ruling on an applicant's eligibility," even though the actual granting of relief was "not a matter of right under any circumstances, but rather is in all cases a matter of grace".

533 U.S. at 307–08, 121 S.Ct. 2271 (quoting *Jay v. Boyd*, 351 U.S. 345, 353–54, 76 S.Ct. 919, 100 L.Ed. 1242 (1956) (internal citation omitted)).[8]

The issue, therefore, is not whether Section 212(c) relief is constitutionally mandated, but whether a denial of an established right to be informed of the possibility of such relief can, if prejudicial, be a fundamental procedural error. We believe that it can. Deportation usually has very serious consequences; *see, e.g., Fong*

---

8. It is true that in *Perez* the motion to reopen was timely, 330 F.3d at 100, *see* 8 C.F.R. § 1003.23(b)(1) (motion to reopen must be filed within 90 days of date of entry of final order of removal), while Copeland's was not. However, under the rationale of *Perez,* this is not a material difference because the IJ had power to reopen Copeland's case despite the untimeliness of his motion. An IJ "may upon his or her own motion at any time, or upon motion of the Service or the alien, reopen or reconsider any case." 8 C.F.R. § 1003.23(b)(1). Moreover, as noted, the IJ did in fact address Copeland's claim on the merits, ruling that he was ineligible for Section 212(c) relief because his deportation proceeding began after the passage of AEDPA. Thus, Copeland's motion to reopen and appeal of the denial of that motion served the purposes of the administrative exhaustion requirement—allowing the IJ and BIA to correct error.

*Haw Tan v. Phelan*, 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433 (1948) ("[D]eportation is a drastic measure and at times the equivalent of banishment or exile ...."), and, for many aliens in cases such as the present one, Section 212(c) is the only available avenue of relief. Moreover, as the Supreme Court has noted, Section 212(c) relief is in fact granted in a very "substantial percentage" of cases. *St. Cyr*, 533 U.S. at 296, 121 S.Ct. 2271. Finally, as noted *supra*, IJs have special responsibilities toward aliens in deportation proceedings. *See Yang*, 277 F.3d at 162 & n. 3.

*St. Cyr* also recognized the importance of being able to seek such relief and that the right to seek such relief, even if discretionary, cannot be lightly revoked. In the context of its retroactivity discussion, the Court noted that "IIRIRA's elimination of any possibility of § 212(c) relief for people who entered plea agreements with the expectation that they would be eligible for such relief clearly 'attaches a new disability, in respect to transactions or considerations already past.'" *St. Cyr*, 533 U.S. at 321, 121 S.Ct. 2271 (quoting *Landgraf v. USI Film Products*, 511 U.S. 244, 269, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)) (some internal quotation marks omitted); *see also id.* at 323, 121 S.Ct. 2271 ("preserving the possibility of [Section 212(c)] relief would have been one of the principal benefits sought by defendants deciding whether to accept a plea offer or instead to proceed to trial").

Moreover, in *Perez*, we held a deportation proceeding to be fundamentally unfair when the erroneous advice of counsel caused an alien who was "eligible for § 212(c) relief and could have made a strong showing in support of such relief" to fail to apply for waiver. 330 F.3d at 104. While different, the circumstances here are analogous with regard to the importance of being able to seek Section 212(c) relief. We therefore conclude that the IJ's error was of a fundamental nature.

We turn now to whether that error prejudiced Copeland. Prejudice is shown where "defects in the deportation proceedings may well have resulted in a deportation that would not otherwise have occurred." *Fernandez–Antonia*, 278 F.3d at 159 (internal quotation marks and citation omitted). In other words, Copeland must show that he likely would have been granted Section 212(c) relief if he had obtained a hearing. We have not decided what level of proof is required for a showing that an alien likely would not have been removed, but we have flirted with two possible standards: a "reasonable likelihood" and a "plausible showing." *Id.* at 159–60 (internal quotation marks omitted).

In our view, however, the appropriate test for prejudice is the one used to decide ineffective assistance of counsel claims, namely, prejudice is shown where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland v. Washington* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This analogy is close-fitting because the denial of an opportunity to apply for Section 212(c) relief will generally be the result either of a lawyer having caused an eligible alien to fail to apply, *United States v. Perez*, 330 F.3d 97, 104 (2d Cir.2003), or of an IJ, owing special duties to a *pro se* alien, having failed to give notice of such an opportunity, *see supra* at 63–64. In the latter case, therefore, prejudice is shown where there is a reasonable probability that, but for the IJ's unprofessional errors, the alien would have been granted Section 212(c) relief.

Resolution of the prejudice issue in the Section 1326(d)(3) context is somewhat akin to a trial within a trial. The district

court must determine whether there is a reasonable probability that the alien would have obtained relief had he or she been informed of, and sought, a Section 212(c) hearing. The court must first obtain all of the facts relevant to the particular alien and then apply standards established under Section 212(c) to those facts, taking into account actual cases in which similarly situated aliens have been granted or denied discretionary relief.

A Section 212(c) determination involves a balancing of "the adverse factors evidencing an alien's undesirability as a permanent resident with the social and humane considerations presented in his behalf to determine whether the granting of section 212(c) relief appears in the best interests of this country." *Matter of Marin*, 16 I. & N. Dec. 581, 584 (BIA 1978); *accord Douglas v. INS*, 28 F.3d 241, 243–44 (2d Cir.1994). Adverse factors include: the nature and circumstances of the exclusion ground at issue, the presence of additional immigration law violations, the existence of a criminal record and its nature, recency and seriousness, and the presence of other evidence indicative of an alien's bad character or undesirability as a permanent resident. *Marin*, 16 I. & N. Dec. at 584–85. Favorable considerations include: family ties within this country, residence of long duration in this country, arrival in the country at a young age, evidence of hardship to the alien and the alien's family upon deportation, Armed Forces service, employment history, community service, property or business ties, evidence attesting to good character, and, in the case of one convicted of criminal conduct, proof of genuine rehabilitation. *Id.*

"Where ... an alien is deportable by reason of two narcotics convictions, the alien must make a showing of unusual or outstanding countervailing equities to obtain a waiver of deportation." *Lovell v. INS*, 52 F.3d 458, 461 (2d Cir.1995) (citing *Correa v. Thornburgh*, 901 F.2d 1166, 1170 (2d Cir.1990)). However, the Supreme Court noted in *St. Cyr* that at the time of its decision, over half of all Section 212(c) applications had been granted. 533 U.S. at 296 n. 5, 121 S.Ct. 2271.

Because the parties to the present matter could not have anticipated the precise nature of our decision, it would not be appropriate for us to review the district court's finding of prejudice on the present record. Specifically, although the record includes comprehensive evidence of Copeland's criminal history, there is little detail about Copeland's family relationships or other potentially favorable considerations. Such evidence would be essential to any finding that Copeland was prejudiced by the lack of a Section 212(c) hearing, given the fact that Copeland's criminal record is quite serious. Moreover, the district court's conclusion as to prejudice was based on an incomplete review of the relevant factors. Not only did the court lack the testimony just discussed, but it also declined to consider the full extent of Copeland's criminal record.[9] However, Copeland's entire criminal record at the time of his deportation is relevant.

9. The district court stated at the September 18, 2002 hearing that it considered Copeland's convictions other than the narcotics conviction for which he was deported irrelevant to the success of Copeland's collateral attack on his deportation proceeding. Specifically, the court asked for the exhibit documenting the conviction for which Copeland was deported. When provided with the exhibit, the court said "that is all I am concerned about. I am not concerned about his other record. That might very well result in the defendant's being denied any relief under 212(c)."

We therefore remand for findings based on a full record—supplemented if necessary by an evidentiary hearing—on the question of whether Copeland was prejudiced by the IJ's failure to advise him of his right to seek Section 212(c) relief.

CONCLUSION

For the foregoing reasons, we hold that: (i) Copeland exhausted his administrative remedies by filing a motion to reopen and appealing the denial of that motion; (ii) Copeland was denied the opportunity for judicial review because direct review was unavailable and he never had a realistic opportunity to seek habeas review; and (iii) the IJ's failure to inform Copeland of his right to seek discretionary relief was a procedural error sufficient to render the deportation order fundamentally unfair if that failure prejudiced Copeland. Because the record is inadequate with regard to whether Copeland was prejudiced, we vacate the dismissal of the indictment and remand to the district court for an evidentiary hearing and findings on that question.