Wayne WILLIAMS, Petitioner,

v.

UNITED STATES of America,
Respondent.

Civil No. 3:06cv972 (JBA).

United States District Court,
D. Connecticut.

May 9, 2008.

Donald J. Cretella, Jr., Zingaro & Cretella, Bridgeport, CT, James E. Swaine, Law Offices of James E. Swaine, New Haven, CT, for Petitioner.

Krishna R. Patel, U.S. Attorney's Office, Bridgeport, CT, for Respondent.

## RULING ON PETITIONER'S MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE

JANET BOND ARTERTON, District Judge.

In 2005, Petitioner Wayne Williams pleaded guilty to one count of illegal reentry in violation of 8 U.S.C. § 1326 and was sentenced to a term of imprisonment of 46 months. He now seeks post-conviction relief pursuant to 28 U.S.C. § 2255 on the ground that he was not afforded constitutionally effective assistance of counsel. At bottom, this claim stems from Williams's belief that federal prosecutors promised him, in connection with either his guilty plea or his cooperation, that the Office of the U.S. Attorney would do all in its power to prevent his deportation in return for either his guilty plea to a marijuana distribution charge or his cooperation. Magistrate Judge Joan Glazer Margolis held a hearing on March 13, 2008 to allow Williams to present the evidentiary basis for this "promise" and subsequently issued a recommended ruling which found, in relevant part, that Williams had not demonstrated that the federal government made the promise he claims. After full de novo review, the Court adopts the recommended ruling's conclusion in this respect and overrules the objections thereto. Because the finding that there was no promise is sufficient for disposition of the case, it is unnecessary to address the additional conclusions in Magistrate Judge Margolis's ruling and the accompanying objections. As explained below, Williams's § 2255 motion must therefore be denied.

## I. Background

Chronologically, this case traces back to a multi-defendant drug prosecution begun in 1999. Williams, a Jamaican native, was indicted on federal conspiracy and possession counts relating to a marijuana distribution network. He was represented primarily by Keith DuBay in the case. With DuBay's concurrence, Williams agreed to cooperate with the government in the investigation of a murder, believed to have been committed by his cell mate, by wearing a wire by means of which a recorded confession which described the details of the crime was obtained. The government thereafter filed a motion for a downward departure pursuant to U.S.S.G. § 5K1.1, which was granted, and Williams was sentenced to time served. During this sentencing proceeding on April 11, 2001, DuBay explained on the record that he "expect[ed] the Government, specifically the U.S. Attorney's Office, to do all in its power to prevent the deportation of Mr. Williams." (Sent'g Tr., Apr. 11, 2001, 13:25–14:3.)

Shortly thereafter, the Immigration and Naturalization Service took Williams into custody and initiated removal proceedings. DuBay told Williams's immigration attorney, Carlton Hume, of the government's alleged promise, but Hume did not appeal the subsequent final order of removal on Williams's behalf. Williams was removed to Jamaica in August 2001.

Three years later, Williams returned to the United States without authorization. After Immigration and Customs Enforcement became aware of his presence, he was taken into custody and indicted on one count of illegal reentry, to which he pleaded guilty. On July 29, 2005, this Court sentenced Williams to a 46–month term of imprisonment. Williams did not appeal. In June 2006 he filed a § 2255 motion [Doc. # 1] challenging the 2005 conviction and sentence, arguing that his lawyer was ineffective and that the indictment was constructively amended. On April 5, 2007,

482 F.Supp.2d 243 [Doc. # 15], the Court denied this second ground for relief and appointed counsel to represent Williams on the first ground.

After briefing by the parties, the Court determined that an evidentiary hearing may be necessary to allow Williams to show the existence and nature of the promise he says the U.S. Attorney's Office made to him in relation to his 2001 guilty plea and sentence. The Court referred the hearing to Magistrate Judge Margolis for a factual determination of whether the government had promised Williams relief from deportation, which the parties agree is a prerequisite to § 2255 relief. This hearing was held on March 13, 2008 and Williams's lawyer called Keith DuBay as the only witness, who testified about his recollection of the circumstances surrounding the plea negotiations seven years earlier. Magistrate Judge Margolis issued a recommended ruling on March 20, 2008, in which she concluded, in summary, that: (1) no "*specific* promise was made that Petitioner would not be deported"; (2) "even if there had been such a promise," it would not have been binding; (3) such a promise, if it existed, must have been in writing to be enforceable; and (4) Williams could not have reasonably relied on any such promise. (Rec. Ruling at 10–11.) Williams then timely objected to this ruling in nearly every respect.

## II. Legal and Procedural Framework

Pursuant to Local Rule 72.2(b) and Federal Rule of Civil Procedure 72(b), this Court reviews de novo the portions of the Magistrate Judge's decision objected to by the Petitioner and may adopt, reject, or modify any part or the entirety of the recommended ruling. *See also* 28 U.S.C. § 636(b)(1).

The threshold question in this case is whether there was any promise between Williams and agents of the federal government related to his 2001 guilty plea which would have been grounds to dismiss the illegal reentry indictment. In essence, Williams contends that he had a contractual agreement with the government: he agreed to cooperate with a federal investigation and provided crucial evidence of a murder, and the government agreed to use its powers to prevent Williams's deportation. According to Williams, he fully performed his obligations according to this agreement but the government did not, and so Williams is now seeking relief from the indirect consequences of this alleged breach.

From this initial inquiry, however, there is a lengthy chain of events that must be reconnected to reach the circumstance from which Williams seeks post-conviction relief. Under the standard described in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Williams must demonstrate that his lawyer's representation " 'fell below an objective standard of reasonableness,' and that he was prejudiced by [his] counsel's deficient acts or omissions." *Johnson v. United States*, 313 F.3d 815, 817–18 (2d Cir. 2002) (quoting *Strickland*, 466 U.S. at 687–90, 104 S.Ct. 2052). According to Williams, his criminal attorney representing him in connection with the illegal reentry charge should have moved to dismiss the indictment because the underlying removal order was invalid; and this removal order was invalid, in turn, because his immigration attorney, Hume, should have raised on appeal the government's alleged non-deportation promise. Under *Strickland*, Williams must also satisfy the "prejudice" prong, which requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104

S.Ct. 2052. In other words, because at bottom Williams is challenging the administrative proceedings which returned him to Jamaica, giving rise to his subsequent illegal reentry conviction, *Strickland* requires him to show that he likely would not have been convicted of illegal reentry if his lawyer had challenged his removal order as he describes or if he had not been deported due to the U.S. Attorney's Office's intervention.[1]

The difficulty of reconstructing this counterfactual scenario is apparent. The parties agree that any ruling in Williams's favor, however, would first require finding the existence of a promise. Magistrate Judge Margolis explained her factual findings in this regard as follows:

> Attorney DuBay testified that he has a "vague recollection" of a plea agreement but that he does not believe that anything was put in writing regarding "what the Government would do when it came to [Petitioner's] deportation"; there were only promises. Attorney DuBay conceded that it would not have "made sense" for the Government to put this promise in writing because in case Petitioner's testimony was ever used in a criminal prosecution, on cross-examination, Petitioner could "honestly respond" that no promises were made in exchange for his testimony....
>
> As stated above, Attorney DuBay testified that this "may have been [his] first federal case" in Connecticut, and that it was his "belief" that the U.S. Attorney's Office can prevent deportations. He admitted that he did not conduct any research; he relied on his "assumption" and a promise from the FBI agents and

the U.S. Attorney's Office. Attorney DuBay expressed that, in addition to the reason already articulated, because of his "trust of these people," whom he had come to know over the past year and a half, he was not surprised that the promise was never in writing.

(Rec. Ruling at 5–6.) On this record, Magistrate Judge Margolis concluded that "[t]here is no evidence that a *specific* promise was made that Petitioner would not be deported." (*Id.* at 10.) As the recommended ruling explains, DuBay characterized the promise as "nebulous," but he was certain that it was real. (*Id.* at 4.) Williams thus lodged the following objection:

> The Petitioner claims that the evidence presented did prove a "promise" made by the Government, to wit: that the Government "would use their best efforts" and "all in its power to prevent the deportation of Mr. Williams." The issue was not whether there was a specific promise by the Government to prevent the actual deportation of Mr. Williams but more accurately that there was a promise to do all within its power to try to bring about that result. The Court's recommended ruling is in error in failing to find such a "promise" which as to Mr. Williams was enforceable.

(Obj. to Rec. Ruling at 1–2.)

### III. Discussion

▆▆▆ Against this backdrop, the first question is whether agents for the federal government made a promise to Williams during plea negotiations seven years ago concerning their efforts to keep him from

---

1. At an earlier stage in this case, the parties and the Court addressed the statutory framework relevant to collateral review of a deportation proceeding. However, the Second Circuit has explained that to successfully challenge a conviction for violating 8 U.S.C. § 1326, a petitioner must demonstrate "fundamental unfair[ness]" according to the same test "used to decide ineffective assistance of counsel claims, namely," the *Strickland* prejudice inquiry. *United States v. Copeland,* 376 F.3d 61, 73 (2d Cir.2004).

being deported to Jamaica. As a type of contract, a plea or cooperation agreement should be "construed according to contract law principles." *United States v. Yemitan*, 70 F.3d 746, 747 (2d Cir.1995). In general, "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). To this end, courts should construe the terms of a plea bargain "strictly against the Government," presume that the parties "contemplated that all promises made were legal," and "apply general fairness principles" when appropriate. *United States v. Ready*, 82 F.3d 551, 559 (2d Cir.1996).

■ In evaluating the terms of a plea agreement, the party claiming breach must establish the existence of the challenged term and the breach thereof by a preponderance of the evidence. *United States v. Byrd*, 413 F.3d 249, 251 (2d Cir.2005). Unlike the more common situation where a court must determine whether the government or a defendant performed its obligations under a recognized plea agreement, *e.g., United States v. Griffin*, 510 F.3d 354, 364–66 (2d Cir.2007) (finding that the government breached the plea agreement by agreeing to a three-level downward adjustment for acceptance of responsibility but then voicing detailed and unsolicited skepticism about whether this adjustment was merited), this case concerns the more fundamental issue of what were the terms of the promise said to induce his guilty plea and/or cooperation. By the Restatement's definition, "[a] promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." Restatement (Second) of Con-

tracts § 2(1) (1981). But a promise giving rise to enforceable obligations "must be sufficiently definite to enable the courts to give it an exact meaning." 1 Richard A. Lord, *Williston on Contracts* § 4:21 (4th ed. 2007). Importantly, "a promise must not only manifest an intention to act or forbear but must also justify in the promisee an understanding that the promisor has made a commitment to act or forbear." *Id.* § 1.2.

Williams's evidence in support of his contention that the government made a promise and then broke it is the testimony of Keith DuBay. When asked about the proffer session during which Williams agreed to cooperate, DuBay recalled:

A: Well, after speaking with Wayne [Williams] in the lock-up, I—and before he gave his information, I expressed to the FBI agents, U.S. attorney's office, and other present, that, you know, he's willing to [cooperate], but he'd like your help when it comes—when and if an immigration issue arises.

Q: Okay. And what response did you get from the government, to that inquiry?

A: As I think I said in my affidavit, it—there was a promise that they would use their best effort. It was a nebulous sort of promise.... There was no detail as to what those best efforts would be. As in any kind of agreement of this nature, it's all oral. There is nothing in writing, in case his testimony has to be used at some later date, and therefore, he won't—doesn't leave himself open for cross-examination as to promises being made, but it was my understanding that the government, i.e., the U.S. attorney's office, would do all they could to prevent his deportation.

Q: Okay. And as you just testified, that understanding was, in fact, never reduced to writing.

A: No.

(Tr., 19:4–20:3.) DuBay then elaborated on these circumstances under cross-examination by the Government:

Q: [Y]ou're certain that there's nothing in any written document about this nebulous promise that you told the Court about, correct?

A: I'm reasonably certain of that, yes.

Q: Okay. And you indicated, during your direct testimony, that it's you're belief that the reason this was never written down [was] so that nobody could ever cross-examine Mr. Williams about the fact that there was this other promise. Is that your testimony?

A: Yes.

(*Id.*, 33:12–23.) The Government pressed DuBay further on why exactly the alleged non-deportation promise was never memorialized:

Q: I want to be clear here. You're not suggesting for a moment, that anyone in the Federal Government participated in some type of fraud, by keeping this so-called nebulous promise out of the proffer agreement, correct?

A: No.

Q: Okay.

A: I'm not suggesting a fraud.

Q: Okay. So really, what you're saying is, in fairness to you, Mr. DuBay, you have no idea why this wasn't written down, correct?

A: No, I have an idea. I have an assumption. I have a belief why it wasn't written down.

Q: Well, tell us what your belief is.

A: My belief is that by—in case Mr. Williams' [s] testimony had to be used in a criminal prosecution, he therefore, could honestly respond, when cross-examined by a defense attorney, "Have any promises been made in connection with your testimony?", he could honestly respond, "No."

Q: That's your belief?

A: Yes.

Q: And that's not based on anything you were told by any representative of the government, correct?

A: No. I mean, "Yes." Yes, that's correct.

Q: So nobody from the government told you that?

A: Correct.

Q: That's just your belief?

A: Correct.

(*Id.*, 34:21–35:25.)

DuBay's account of the circumstances surrounding Williams's 2001 guilty plea is self-evidently implausible. By DuBay's telling, Williams was the beneficiary of a promise made by the federal government that it would do something to assist with his immigration problem resulting from his drug conviction. This promise, he said, may have been "nebulous" and unrecorded, but it nevertheless led DuBay (and Williams) to believe that there would be some preventative action taken. When asked exactly what the promise meant, DuBay described it only as an assurance that the prosecutors, without giving any specific details, "would do all they could to prevent his deportation." DuBay cannot reconcile this characterization of the "promise" with his view that Williams could have truthfully testified that there were no promises made to him by the federal government. As the Second Circuit noted in a related context, "[c]ontrac-

tual principles simply do not support [his] attempt to have his cake and eat it, too." *United States v. Roque,* 421 F.3d 118, 124 (2d Cir.2005) (quotation marks omitted). There either was or was not a promise. If a promise was made, then Williams can seek to have it form the basis for relief here, but he could not have testified truthfully as in DuBay's hypothetical that there were no promises. Or, if a promise was not made, Williams could clearly testify as much under oath, but, of course, then there would be no basis on which to grant relief in this case.

That there was no promise made concerning Williams's immigration situation is further confirmed by the written plea agreement between Williams and the U.S. Attorney's Office, dated November 7, 2000, which specifically limited the effect of the agreement and contemplated the collateral consequences of deportation as a result of Williams's guilty plea, as well as specified the non-existence of any other promises. (Plea Agmt., Gov't's Apr. 4, 2008 Mem., Ex. 1.) The agreement provided:

> The defendant acknowledges and understands that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority....
>
> Additionally, the defendant understands that the United States Immigration and Naturalization Service may undertake to institute deportation proceedings against him and he may be deported from the United States as an independent consequence of his conviction. The parties additionally agree that any period of supervised release imposed in this case will include the special condition that if a final Removal Order for his deportation from the United States is obtained by the [INS], that once deported, the defendant shall remain outside of the United States pursuant to [18 U.S.C.

§ 3583(d) ] and that he not re-enter the United States without the express permission of the Attorney General....

> The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agreement, and none will be entered into unless set forth in writing, signed by all parties.

(*Id.* at 6–7.) Williams and DuBay signed the agreement on January 6, 2001, and it was filed with the court when he entered his guilty plea on January 9.

On this record, Williams has not sustained his burden of establishing that the government breached a promise given in exchange for his cooperation and/or guilty plea, which would have prevented his deportation. It is not enough for Williams to assert that a promise existed merely because he and DuBay assumed or believed it did, and its existence is undermined by characterizing the alleged promise as "nebulous" or non-specific, sidestepping the unavoidable question whether the terms of the promise were clear and definite to both parties such that it could form the basis for the relief now sought. In light of the written, executed plea agreement which clearly put Williams on notice that he may be deported, that only the U.S. Attorney's Office was bound, and that any promises would be in writing, Magistrate Judge Margolis appropriately concluded that the evidence shows that no promise existed.

■ With this, the analysis returns to the ineffective-assistance standard that controls the relief Williams seeks with his § 2255 motion. Under *Strickland,* he must show that his criminal attorney's representation in the illegal reentry prosecution was both professionally inadequate and prejudicial. Because there is no evidence of a promise which the U.S. Attorney's Office made in connection with the

2001 guilty plea, Williams's attorney did not err by not moving to dismiss the illegal reentry indictment. Relatedly, Williams has failed to demonstrate that he likely would not have been convicted of illegal reentry because there is no reasonable basis to challenge the validity of the 2001 removal order. More fundamentally, even adopting DuBay's account of the facts, there is no evidence that *compliance* with the terms of the "nebulous" promise— which, in his words, only required the U.S. Attorney's Office "to do all in its power"— would have impacted the removal order or prevented Williams's deportation by another agency. For this reason, Williams's principal objection, that "the evidence presented did prove a 'promise' made by the Government," misses the point of the analysis—namely, that whatever "promise" was made, it must have been of such a character that Williams can now rely on it to meet the elements of *Strickland.* Williams has offered nothing more than DuBay's testimony about his unsubstantiated belief in the existence of a "nebulous sort of promise" with "no detail," a belief which is undermined by DuBay's own version of the facts and by the terms of the written plea agreement DuBay signed. Therefore, without a showing that the criminal attorney failed to act on an actual promise and that such inaction led to a different outcome in the illegal reentry prosecution, there can be no post-conviction relief in this case.

## IV.  Conclusion

Accordingly, Petitioner Wayne Williams's objections to Magistrate Judge Margolis's conclusion that there was no promise are overruled, the recommended ruling [Doc. # 34] is adopted in part, and the Petitioner's Motion to Vacate, Set Aside or Correct Sentence [Doc. # 1] is denied. Because Williams has not made a showing of the denial of a constitutional right, a certificate of appealability will not issue. The Clerk is directed to close this case.

IT IS SO ORDERED.