**UNITED STATES of America,
Plaintiff,**

v.

**Francisco Jose CASTRO, Defendant.**

**No. 1:06–cr–00376–ENV–MDG–ALL.**

United States District Court,
E.D. New York.

Jan. 17, 2007.

Jacqueline L. Spratt, United States Attorney's Office, E.D.N.Y., Brooklyn, NY, for the United States.

Justine A. Harris, Federal Defenders of New York, Brooklyn, NY, for Defendant Francisco Jose Castro.

## OPINION AND ORDER

VITALIANO, District Judge.

On June 8, 2006, defendant Francisco Jose Castro was indicted under 8 U.S.C. §§ 1326(a) and 1326(b)(2) for the crime of illegal reentry into the United States subsequent to deportation for an aggravated felony. By motion dated August 4, 2006, defendant seeks to dismiss this indictment under Federal Rule of Criminal Procedure 12(b)(2) and the Fifth Amendment on the ground that his prior deportation was unlawful. For the reasons stated below, the Court grants defendant's motion to dismiss the indictment.

## I. FACTS

Castro was born in the Dominican Republic on August 10, 1964. In 1986, at the age of 21, Castro immigrated to the United States as a legal permanent resident to join his mother, Luz Marina Castro, and his brother, Manuel Reynaldo Castro, who were already legal permanent residents.[1] Upon his arrival in New York, Castro moved in with his mother and a cousin, who resided together in Queens. Soon afterward, Castro began working at a bakery in downtown Manhattan. Tr. 4–5, 8.

In 1987, Castro became romantically involved with a woman named Josefina Saba. The couple eventually moved in together and had three daughters: Tatiana, born August 24, 1988; Yasiris, born September 21, 1989; and Kendra, born July 3, 1992. By all accounts, Castro was a doting and loving father to his three girls, taking responsibility for a substantial part of their dayto-day care and escorting Tatiana and Yasiris, who suffered from, respectively, severe asthma and eye problems, to their

---

1. Castro's mother became a naturalized U.S. citizen in 1996, prior to the re-opening of Castro's deportation hearings. His father, whom Castro testified had not played any part in his upbringing, apparently was also granted U.S. citizenship that same year. *See* Harris Aff., Ex. I; Hearing Transcript ("Tr.") 3–4, 65.

frequent doctors' appointments. *Id.* at 9–11, 47, 49, 53, 59, 63, 69. Castro was also the sole breadwinner for his growing family, working at a variety of supermarkets, delis, restaurants and bodegas in the New York City area in order to support them. *Id.* at 6–7, 12. Although Castro moved back in with his mother in 1993 due to escalating problems in his relationship with Saba, he continued to visit his children frequently and to provide financial support. *See, e.g., id.* at 12–13.

On May 6, 1994, however, Castro was arrested in the Bronx and charged with selling cocaine in violation of Section 220.39 of the New York State Penal Law. Castro pled guilty to criminal sale of a controlled substance in the third degree on May 25, 1994. He was subsequently sentenced to four to twelve years incarceration. Harris Aff., Ex. E, F, H. While in prison, Castro participated in drug treatment programs, pursued his GED, and took electrical engineering courses. *See* Tr. 17–18, 50. Prison files indicate that he performed well in all work and program assignments and was not involved in any significant disciplinary incidents. Harris Aff., Ex. G. During his incarceration, Castro remained in close contact with his daughters and the family members who were caring for them in the hope that he could, upon release, "gather my family and be together like before." Tr. 19, 56. Cas-

tro also appeared at several family court proceedings in order to voice his opposition to a plan by the New York City Administration . for Children's Services, which had intervened due to Saba's alleged neglect of the children, to place his daughters for adoption by other families.[2] *Id.* at 16–17, 19–21, 48, 50; Harris Aff., Ex. I.

Nonetheless, because Castro had been convicted of an aggravated felony, the United States Immigration and Naturalization Service ("INS") commenced deportation proceedings against him by an order to show cause dated October 21, 1994. The initial hearings on his deportation were originally scheduled for 1995; however, these hearings were temporarily administratively closed due to timing conflicts with the ongoing family court proceedings. Harris Aff., Ex. H, I.

Castro's deportation hearings were reopened in August 1996. Because Castro could not afford an attorney, he was represented at the proceedings by a priest-advocate, Father Robert Vitaglione ("Father Vitaglione"). At the first hearing, held on August 19, 1996, Father Vitaglione conceded that Castro was not a U.S. citizen and that he had been convicted of an aggravated felony, but requested permission to file on Castro's behalf a § 212(c) application for discretionary relief from deportation.[3] The immigration judge ad-

---

**2.** Castro testified that Saba, by the time of his arrest, had developed a significant drug addiction which ultimately rendered her unable to care for the children on her own. Tr. 13–16. Saba's mother, Adalgisa Acosta (who eventually adopted the children), confirmed Castro's statements, noting that, after Castro was imprisoned, Saba did "nothing to keep things straight ... she was [living] on the street." *Id.* at 50. Saba did not appear at any of the family court hearings. *Id.*

**3.** Former Section 212(c) of the Immigration and Nationality Act ("INA") of 1952, later codified at 8 U.S.C. § 1182(c) (repealed on

September 30, 1996), allowed a waiver of the deportation of an alien convicted of an aggravated felony under certain circumstances:

Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General without regard to the provisions of subsection (a) of this section (other than paragraphs (3) and (9)(C)). Nothing contained in this subsection shall limit the authority of the

journed the hearing to permit time to file the application. Harris Aff., Ex. I.

When the proceedings resumed on October 22, 1996, there was some question as to whether Castro had received the forms necessary to file the formal petition for § 212(c) relief. Nevertheless, because the immigration judge believed that Castro was ineligible for a § 212(c) waiver as a matter of law, he informed Father Vitaglione that he would deem the petition filed and give Castro "a decision which [he] could appeal." The immigration judge then issued a lengthy opinion from the bench, finding that Castro was statutorily barred from seeking § 212(c) relief under § 440(d) of the new Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which he held eliminated, on a retroactive basis, § 212(c) relief for individuals like Castro who had pled guilty before the effective date of the new legislation. Therefore, the immigration judge concluded, Castro was deportable as an aggravated felon pursuant to §§ 241(a)(2)(A)(iii) and 241(a)(2)(B)(i) of the Immigration and Nationality Act ("INA").[4] Harris Aff., Ex. K.

Castro, still represented by Father Vitaglione, timely appealed the immigration judge's order to the Board of Immigration Appeals ("BIA"). In a brief submitted on Castro's behalf, Father Vitaglione challenged the immigration judge's retroactive application of § 440(d) of the AEDPA, arguing that "[a]ppellant was convicted before the date of enactment of AEDPA and as such is not encompassed therein." Harris Aff., Ex. L. However, on April 24, 1997, the BIA dismissed Castro's appeal, upholding the immigration judge's finding that Castro was "statutorily ineligible for [§ 212(c) ] relief" due to AEDPA § 440(d). Harris Aff., Ex. M. Castro was deported back to the Dominican Republic on July 31, 1997. Harris Aff., Ex. N.

On May 13, 2006, Castro reentered the United States via an American Airlines flight that had originated in Santo Domingo in the Dominican Republic. Upon his arrival at John F. Kennedy International Airport in Queens, New York, Castro presented his Dominican passport as well as his resident alien card. A computer query by a Customs and Border Patrol ("CBP") official then revealed that Castro had been deported from the United States in 1997 subsequent to a conviction for an aggravated felony and that he had not been granted permission from the Attorney General to reenter the United States. Accordingly,

Attorney General to exercise the discretion vested in him under section 1181(b) of this title. The first sentence of this subsection shall not apply to an alien who has been convicted of one or more aggravated felonies and has served for such felony or felonies a term of imprisonment of at least 5 years.

8 U.S.C. § 1182(c)(1994). Although this section, on its face, applied only to aliens seeking to reenter the United States, courts had interpreted it as also applying to aliens seeking relief from deportation. *See, e.g., Francis v. I.N.S.*, 532 F.2d 268, 273 (2d Cir.1976)(rationalizing that "[f]undamental fairness dictates that permanent residents who are in like circumstances, but for irrelevant and fortuitous factors, be treated in a like manner"); *see also Drax v. Reno*, 338 F.3d 98, 107–08 (2d Cir.2003)(describing general availability of § 212(c) relief).

4. Section 241(a)(2)(A)(iii) of the INA provided that "[a]ny alien who is convicted of an aggravated felony at any time after entry is deportable," while § 241(a)(2)(B)(i) provided that "[a]ny alien who at any time after entry has been convicted of a violation of … any law or regulation of a State, the United States, or a foreign country relating to a controlled substance …, other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable." 8 U.S.C. §§ 1251(a)(2)(A)(iii) and 1251(a)(2)(B)(i) (1996). Both of these provisions later became part of 8 U.S.C. § 1227.

following a verification of his identity through a fingerprint match with previously-obtained fingerprints stored in an FBI database, Castro was arrested. Harris Aff., Ex. A. On June 8, 2006, a grand jury indicted Castro on one count of illegal reentry into the United States in violation of 8 U.S.C. §§ 1326(a) and 1326(b)(2). Harris Aff., Ex. B. Castro filed the instant motion, on August 4, 2006, to dismiss that indictment on the ground that the underlying deportation order was invalid.

## II. DISCUSSION

### A. *Background*

This motion requires the Court to harmonize the sea change in the handling of the immigration status of aliens convicted of felonies caused by Congress's enactment of AEDPA and the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), both of which became law in 1996, with the fate of aliens facing deportation as a result of felony convictions entered prior to those enactments. Under these revised immigration laws, an alien who is convicted of an aggravated felony becomes automatically deportable. *See* 8 U.S.C. § 1227(a)(2)(A)(iii). Prior to April 24, 1996, however, a lawful permanent resident convicted of such an offense, but who had lived in the United States at least seven consecutive years, was eligible to file for a discretionary waiver of deportation as long as he/she had not been "convicted of one or more aggravated felonies and ha[d] served for such felony or felonies a term of imprisonment of at least 5 years." 8 U.S.C. § 1182(c) (1994); *see also* note 3, *supra*. Whether to grant such discretionary relief-commonly referred to as a § 212(c) waiver-depended upon a balancing of the "adverse factors evidencing an alien's undesirability as a permanent resident with the social and humane considerations presented in his behalf." *United*

*States v. Perez*, 330 F.3d 97, 102 (2d Cir. 2003); *Lovell v. I.N.S.*, 52 F.3d 458, 461 (2d Cir.1995). The Government does not dispute that Castro, a lawful permanent resident who had lived in the United States for approximately eight years at the commencement of his deportation hearings and who had not served a term of imprisonment of at least five years for an aggravated felony, would have been eligible for § 212(c) relief under the INA had the laws remained unchanged.

On its effective date, April 24, 1996, AEDPA amended 8 U.S.C. § 1182(c) to render aliens who had pled guilty to aggravated felonies, regardless of their length of residency in the United States, ineligible for § 212(c) relief. *See* AEDPA § 440(d). On September 30, 1996, Congress again amended the INA. This time, § 212(c) was repealed entirely and replaced with a new section granting the Attorney General the discretion to cancel deportation only for a narrowly defined class of inadmissable or deportable aliens-a class which did not include persons "convicted of any aggravated felony." *See* IIRIRA § 304(b).

For several years following the AEDPA and IIRIRA sea change, "the law was unclear as to whether and how AEDPA and IIRIRA applied to pre-enactment convictions and guilty pleas." *United States v. Garcia–Jurado*, 281 F.Supp.2d 498, 502 (E.D.N.Y.2003). At the time of Castro's deportation hearings, the BIA's position was that the 1996 amendments to INA applied retroactively to aliens who, like Castro, had pled guilty to at least one aggravated felony prior to the effective date of the amendments. *See In re Soriano*, 21 I. & N. Dec. 516 (BIA June 27, 1996). This position was advanced despite the fact that the alien may have, of course, pled guilty in anticipation of applying for § 212(c) relief. *See, e.g., United States v. Copeland*, 376 F.3d 61, 73 (2d

Cir.2004)(noting that "preserving the possibility of [§ 212(c)] relief would have been one of the principal benefits sought by defendants deciding whether to accept a plea offer or instead to proceed to trial")(internal citations omitted). In any event, several courts in this circuit and elsewhere vehemently disagreed with the BIA's retroactive application of these statutes, arguing that the Fifth Amendment's due process clause placed a very narrow limit on "Congress's power to [retroactively] sweep away ... settled expectations under the law." *St. Cyr v. INS*, 229 F.3d 406, 416 n. 6 (2d Cir.2000); *see also Mattis v. Reno*, 212 F.3d 31, 37 (1st Cir.2000); *Tasios v. Reno*, 204 F.3d 544, 551 (4th Cir.2000); *Magana–Pizano v. INS*, 200 F.3d 603, 612 (9th Cir.1999); *but see Jurado–Gutierrez v. Greene*, 190 F.3d 1135, 1150–52 (10th Cir.1999)(adopting the INS's position that AEDPA § 440(d) could be applied retroactively to pre-enactment convictions). In 2001, the Supreme Court finally addressed the issue, ruling that " § 212(c) relief remains available for aliens ... whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212(c) relief at the time of their plea under the law then in effect." *INS v. St. Cyr*, 533 U.S. 289, 326, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), *aff'g*, 229 F.3d 406 (2d Cir.2000).

That same year, the Supreme Court also resolved the issue of whether habeas review of deportation proceedings survived IIRIRA. IIRIRA had unambiguously eliminated direct judicial review of such proceedings for aliens convicted of aggravated felonies. *See, e.g.*, 8 U.S.C. § 1252(a)(2)(C)(providing that "no court

shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed [certain] criminal offense[s]"). The same could not be said about whether Congress also intended this language to strip courts of their habeas jurisdiction. *See Reno v. American-Arab Anti–Discrim. Comm.*, 525 U.S. 471, 480 n. 7, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999)(commenting that "[t]here is disagreement ... among the Courts of Appeals" as to whether habeas review of deportation proceedings was still available as a result of IIRIRA); *also compare Yang v. INS*, 109 F.3d 1185, 1195 (7th Cir.1997)(finding that IIRIRA abolished the possibility of habeas review under 28 U.S.C. § 2241) *with Henderson v. INS*, 157 F.3d 106, 112–22 (2d Cir.1998)(finding that IIRIRA "left untouched the courts' jurisdiction under the general habeas statute [28 U.S.C. § 2241]"). In its contemporaneous holdings in the companion cases of *St. Cyr*, 533 U.S. at 314, 121 S.Ct. 2271, and *Calcano–Martinez v. INS*, 533 U.S. 348, 121 S.Ct. 2268, 150 L.Ed.2d 392 (2001), the Supreme Court ruled definitively that "the jurisdiction-stripping provisions of [IIRIRA do not] preclude aliens ... from pursuing habeas relief pursuant to § 2241." *Id.* at 351.[5]

Of course, to Castro's detriment, at the time of his deportation proceedings in 1996 and 1997 the Supreme Court had not yet resolved that either § 212(c) relief or habeas review was available to him and others similarly situated.

### B. *Collateral Attacks on Deportation Orders in Illegal Reentry Proceedings*

Title 8 U.S.C. § 1326(a) makes it a crime for an alien who has been deported

---

5. In *St. Cyr*, the Court reasoned that the "absence of [an alternative] forum, coupled with the lack of a clear, unambiguous, and express statement of congressional intent to preclude judicial consideration on habeas of such an important question of law" strongly counseled against a construction of IIRIRA that would strip courts of their habeas jurisdiction. *St. Cyr*, 533 U.S. at 314, 121 S.Ct. 2271.

or removed[6] to enter, attempt to enter, or be found in the United States without the express consent of the Attorney General, and authorizes a maximum prison sentence of two years for this offense. In 1988, Congress added subsection (b)(2), which supplements subsection (a) by authorizing a maximum prison term of 20 years for "any alien described" in subsection (a) if the initial deportation "was subsequent to a conviction for commission of an aggravated felony." 8 U.S.C. § 1326(b)(2). However, because a prior deportation is a necessary element of the crime of illegal reentry, the Supreme Court has held that an alien can defend against such a charge by challenging the validity of the deportation order upon which the charge is predicated. *See United States v. Mendoza–Lopez,* 481 U.S. 828, 837–39, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987)(holding that because "[a]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to our traditional standards of fairness encompassed in due process of law," it follows that "[d]epriving an alien of the right to have the disposition in a deportation hearing reviewed in a judicial forum requires, at a minimum, that review be made available in any subsequent proceeding in which the result of the deportation proceeding is used to establish an element of a criminal offense.").

In 8 U.S.C. § 1326(d), Congress effectively codified the collateral attack provision of *Mendoza–Lopez.* In full, this section provides:

> In a criminal proceeding under this section, an alien may not challenge the validity of the deportation order described in subsection (a)(1) of this section or subsection (b) of this section unless the alien demonstrates that—

> (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;

> (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and

> (3) the entry of the order was fundamentally unfair.

Because these requirements are conjunctive, the defendant must establish all three prongs to prevail. *United States v. Fernandez–Antonia,* 278 F.3d 150, 157 (2d Cir.2002).

### I. Exhaustion of Administrative Remedies

In the case at bar, Castro timely appealed the immigration judge's denial of § 212(c) relief to the BIA, which subsequently affirmed the immigration judge's holding that Castro was statutorily barred from seeking § 212(c) relief. Because the BIA's decision is the final administrative determination in a case such as this, an appeal of an immigration judge's order to the BIA generally satisfies the exhaustion requirement. *See* 8 C.F.R. § 242.21 (1996); *Mejia–Ruiz v. INS,* 51 F.3d 358, 364 (2d Cir.1995); *United States v. Cottone,* 244 F.Supp.2d 126 (E.D.N.Y.2003). Recognizing the settled nature of this rule, the Government does not dispute that Castro exhausted his administrative remedies by appealing to, and receiving a final decision from, the BIA. *See* Gov't Mem. in Opp. at 5.

---

**6.** IIRIRA, in 1996, generally replaced the term "deportation," referring to the process by which an admitted alien is physically removed from the United States, with the term "removal." *See Evangelista v. Ashcroft,* 359 F.3d 145, 147 n. 1 (2d Cir.2004). To avoid confusion, however, the Court will, in this opinion, refer to this process as "deportation."

## II. *Deprivation of Judicial Review*

██ The second prong of 8 U.S.C. § 1326(d), as noted above, requires an alien to demonstrate that "the deportation proceedings at which the order [of deportation] was issued improperly deprived the alien of the opportunity for judicial review." In interpreting this prong, the Second Circuit has indicated that "judicial review" encompasses both direct appeal from an order of deportation and judicial relief by way of habeas corpus. *See Copeland,* 376 F.3d at 68–69; *United States v. Gonzalez–Roque,* 301 F.3d 39, 49–50 (2d Cir. 2002). The court further noted that where, as here, there was no statutory right to appeal a deportation order directly, but habeas relief was technically available, "judicial review will still be deemed to have been denied if resort to a habeas proceeding was *not realistically possible.*" *Copeland,* 376 F.3d at 68 (emphasis added). Resort to habeas relief would not be realistically possible, the court added, in situations where "the interval between entry of the final deportation order and the physical deportation is too brief to afford a realistic possibility of filing a habeas petition" or where "legal uncertainties as to the availability of habeas review" at all rendered such review illusory. *Id.* at 68–69; *see also United States v. Calderon,* 391 F.3d 370, 376 (2d Cir.2004) (holding that a defendant deported six weeks after issuance of an order of deportation had been denied any realistic opportunity for judicial review because, although he technically "had habeas relief available to him, (a) he was mistakenly advised by the immigration judge to the contrary, and (b) his speedy deportation further limited his opportunity to seek such review"). In 2006, the Second Circuit clarified its earlier holdings by explaining that "[w]hile the interval of time in which it is realistically possible for an alien to seek judicial review may be quite short where the alien has not received misinformation, the analysis differs where the government affirmatively misleads an alien about the availability of relief." *United States v. Lopez,* 445 F.3d 90, 99 (2d Cir.2006).

In the instant case, Castro argues that he was deprived of his opportunity for judicial review because he was deported only three months after the BIA's dismissal of his appeal, thus rendering resort to a habeas corpus proceeding under 28 U.S.C. § 2241 not realistically possible. More importantly, Castro argues that he was affirmatively misinformed as to his eligibility for § 212(c) relief by the immigration judge, whose advice strongly deterred him and Father Vitaglione from seeking further review via a habeas petition. Def.'s Mem. at 7–8. In response, the Government simply contends that Castro could have sought judicial review of his deportation order during the three months between the BIA's decision and his deportation by filing a habeas petition, but did not do so. Govt.'s Mem. in Opp. at 6–9.

After carefully reviewing the record, this Court concludes that Castro has demonstrated that he had no realistic opportunity for judicial review, thus satisfying the second prong of 8 U.S.C. § 1326(d). First, that the time for review was fleeting is undisputed by the Government—Castro was deported to the Dominican Republic on July 31, 1997, only three months after the BIA's dismissal of his appeal on April 24, 1997. Harris Aff., Ex. N. The Government's only retort is its conclusory argument that, however fleeting, the time was sufficient to collaterally attack the deportation order. Equally incontestable, however, is the fact that the immigration judge explicitly informed Castro he was ineligible for § 212(c) relief as a matter of law due to § 440(d) of the new AEDPA, as interpreted by the BIA in its June 27, 1996 *Matter*

*of Soriano* decision.[7] Harris Aff., Ex. K. Even more critically, on April 24, 1997, the BIA affirmed the immigration judge's decision, similarly-and unequivocally-holding that Castro was "statutorily ineligible for [§ 212(c) ] relief" under AEDPA and *Matter of Soriano.* Harris Aff., Ex. M. This misinformation conveyed to Castro by the immigration judge and the BIA that the law barred him from relief, together with the short interval between the final order of deportation and his removal from the United States, provide a compelling foundation for this Court's conclusion that Castro was deprived of any realistic opportunity to seek judicial review.

This conclusion is also significantly bolstered by several very recent cases in this circuit in which defendants with similar, or even substantially longer, intervals between final administrative ruling and deportation and who were also told that they were ineligible for § 212(c) relief as a matter of law were found to have been deprived of a realistic opportunity for judicial review. In *United States v. Lopez,* the Second Circuit held that a defendant who had been informed that he was statutorily ineligible for § 212(c) relief, much like Castro, but who then was not deported to his home country until over 18 months after the entry of the deportation order had been deprived of his opportunity for judicial review. *Lopez,* 445 F.3d at 100. The *Lopez* court reasoned that, even though the defendant could have sought judicial review within that period by filing a habeas petition, the defendant would have been dissuaded from doing so by the erroneous information provided to him. *See id.* at 98 (asserting that "[h]ad the [immigration judge] (and subsequently the BIA) not provided erroneous information to [defendant] about the legal availability of § 212(c) relief, it might have occurred to [defendant] to look for other remedies at law"). Moreover, the court continued, "although ... deportation is a drastic act that should put an alien on notice to search the law for remedies, its administrative nature makes it less likely that an alien would immediately look outside the administrative process for relief." *Id.* at 99–100;[8] *cf.*

---

7. In his October 22, 1996 decision, the immigration judge explained that, in *Matter of Soriano*, the BIA had concluded, after an examination of the amended legislation, that § 212(c) relief was only available to individuals who had applications pending for such relief before April 24, 1996. Castro therefore understood from the immigration judge's decision that he was statutorily precluded from even applying for a § 212(c) waiver, much less being granted such relief. Harris Aff., Ex. K at 4. Additionally, while the immigration judge acknowledged that the Attorney General had recently vacated the BIA's holding in *Matter of Soriano,* resulting in some uncertainty in the law at that point, he held that the case still had substantial "persuasive value," especially in light of the fact that the Attorney General in vacating the holding had left courts without any direction as to this issue. The immigration judge then concluded, before entering his order denying Castro such relief, that "I am not going to become involved in great detail with the actual decision [in *Matter of Soriano* ], but the Court's position is stated in the majority decision found in *Matter of Soriano."* *Id.* at 4–6.

8. The Government's attempt to distinguish *Lopez* is unpersuasive. First, it is of little importance under these circumstances that Lopez was *pro se* at the time the immigration judge issued his initial order of deportation, while Castro was assisted at his appearances before both the immigration judge and the BIA by Father Vitaglione, a nonattorney representative accredited pursuant to 8 C.F.R. § 292.2(a) and who presumably was familiar with deportation procedures. Indeed, by the time of his appeal, Lopez *was* represented by such an advocate. Interestingly enough, it was Father Vitaglione, the very same one who represented Castro. *See Lopez,* 445 F.3d at 97 n. 5. More to the point, what is material here is the almost identical message the immigration judge and the BIA conveyed to both Lopez and Castro, *i.e.,* that § 212(c) relief was categorically unavailable due to the new legis-

*Copeland*, 376 F.3d at 70 (holding that this prong of § 1326(d) had been satisfied, in part because the immigration judge's "failure to give [defendant] accurate information" had not afforded defendant, who was not deported until approximately two years after the entry of his deportation order, a realistic opportunity to seek administrative or judicial review of the order); *United States v. Najera–Trejo*, 2006 WL 2191349, at *5–6 (E.D.N.Y. July 31, 2006)(holding that defendant had had no realistic opportunity for judicial review in light of the facts that he was told he was ineligible for § 212(c) relief and then deported within three months of the BIA's decision affirming his deportation).

Having concluded that Castro has more than met his burden of showing that "the deportation proceedings at which the [deportation] order was issued improperly denied [him] the opportunity for judicial review," 8 U.S.C. § 1326(d)(2), the Court now turns to consideration of whether "entry of the [deportation] order was fundamentally unfair." 8 U.S.C. § 1326(d)(3).

### III. *Fundamental Unfairness*

■ To establish "fundamental unfairness" under § 1326(d)(3), a defendant "must show both a fundamental procedural error and prejudice resulting from that

error." *Fernandez–Antonia*, 278 F.3d at 159; *see also Perez*, 330 F.3d at 104.

Castro argues that he has met both of these requirements because a) the immigration judge and the BIA committed fundamental procedural error by giving him erroneous information regarding his eligibility for § 212(c) relief and b) there is a reasonable probability that he would have been granted § 212(c) relief had he been allowed to seek it. Def.'s Mem. at 9–12. The Government, however, contends that Castro's conviction for selling narcotics would have outweighed any factors in his favor, thus likely precluding any grant of § 212(c) relief. Gov't Mem. in Opp. at 10–13.

#### a. *Fundamental Procedural Error*

■ In this circuit, it is well-established that an immigration judge's erroneous advice regarding an alien's eligibility for § 212(c) relief can constitute fundamental procedural error. *See, e.g., Copeland*, 376 F.3d at 71 (holding that an immigration judge's "failure to advise a potential deportee of a right to seek Section 212(c) relief can, if prejudicial, be fundamentally unfair within the meaning of Section 1326(c)(3)"); *cf. Perez*, 330 F.3d at 104 (finding a deportation proceeding to be fundamentally unfair when erroneous advice regarding the unavailability of a § 212(c) waiver

lation. As for the Government's second argument, *see* Gov't Mem. in Opp. at 8–9, it is also of little consequence that the immigration judge who ordered Castro's deportation in October 1996 indicated in his decision that the state of the law at that time was somewhat unsettled. *(See* footnote 7, *supra.)* Although the Government contends that this alone should have spurred Castro to seek further relief via a habeas petition, the Court notes that by the date the BIA issued its decision on Castro's appeal-April 24, 1997–the uncertainty created by the Attorney General's silence on the subject had evaporated. *See "Authority of the Attorney General to Grant Discretionary Relief from Deportation*

*under Section 212(c) of the Immigration and Nationality Act as Amended by the Antiterrorism and Effective Death Penalty Act of 1996,"* 1997 WL 33347804 (O.L.C.)(Op. Att'y Gen. Feb. 21, 1997)(holding that AEDPA's elimination of § 212(c) relief had to be applied to all cases, regardless of whether an application for such relief had been pending before the law was enacted). Thus, by the time the BIA ruled on Castro's case it was then settled that seeking § 212(c) relief was not an option for Castro-a message which was quite clearly conveyed to Castro by the BIA. *See* Dec. of BIA, April 24, 1997, Harris Aff., Ex. M (specifically referencing the Attorney General's February 21, 1997 ruling).

caused an alien would otherwise could have made a strong showing in support of § 212(c) relief to fail to apply for such relief). That there was such an error here is indisputable.

### b. *Prejudice*

■ "Prejudice is shown where there is a reasonable probability that, but for the [immigration judge's] unprofessional errors, the alien would have been granted Section 212(c) relief." *Copeland,* 376 F.3d at 73. Reasonable probability, in turn, is defined as "a probability sufficient to undermine confidence in the outcome." *United States v. Scott,* 394 F.3d 111, 118 (2d Cir.2005)(quoting *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

To determine whether such prejudice has been shown in a particular case, the Second Circuit has instructed district courts to hold a hearing much like the hearing an immigration judge would have held initially to balance the "adverse factors evidencing an alien's undesirability as a permanent resident with the social and humane considerations presented in his behalf to determine whether the granting of section 212(c) relief appears in the best interests of this country." *Copeland,* 376 F.3d at 73–74 (quoting *Matter of Marin,* 16 I. & N. Dec. 581, 584 (BIA 1978)). In so doing, a court should "obtain all of the facts relevant to the particular alien and then apply standards established under Section 212(c) to those facts, taking into account actual cases in which similarly situated aliens have been granted or denied discretionary relief." *Copeland,* 376 F.3d

at 74. In *Scott,* the Second Circuit reminded courts that because they must view the facts as they existed at the time the initial deportation hearing should have been held, "*ex post* data" should not be considered. *Scott,* 394 F.3d at 118–19 (stating that "in assessing whether the defendant-alien had a reasonable probability of not being deported at his proceeding . . ., the district court should reconstruct events as they existed at the time of the disputed deportation proceeding, without considering future occurrences").[9]

In 1978, the BIA delineated both the adverse and positive factors that immigration judges should weigh when considering a § 212(c) application. *See Matter of Marin,* 16 I. & N. Dec. at 584–85. Factors that were deemed adverse included the "nature and underlying circumstances of the exclusion ground at issue, the presence of additional significant violations of this country's immigration laws, the existence of a criminal record and, if so, its nature, recency, and seriousness, and the presence of other evidence indicative of a respondent's bad character or undesirability as a permanent resident of this country." *Id.* at 584. On the other hand, favorable considerations would include "family ties within this country, residence of long duration in this country, evidence of hardship to the alien and alien's family upon deportation, Armed Forces service, employment history, community service, property or business ties, evidence attesting to good character, and, in the case of one convicted of criminal conduct, proof of genuine rehabilitation." *Lovell v. INS,* 52 F.3d 458, 461 (2d Cir.1995)(summarizing *Marin* ).

---

9. In *Edwards v. INS,* the Second Circuit observed that "what is at stake in the illegal reentry context is *not* the restoration of the defendant's deprived opportunity to apply for § 212(c) relief. Rather, in the illegal reentry context the defendant is asking the court to dismiss the indictment against him . . . ." *Ed-*

*wards,* 393 F.3d 299, 311 (2d Cir.2004)(emphasis in original). At such hearings, therefore, "the courts must necessarily play the role of prognosticator, and divine whether, had the error not occurred, the defendant would likely have obtained immigration relief." *Id.*

■ On November 20, 2006, this Court held a *Copeland* hearing to determine whether there was a reasonable probability that Castro would have been granted § 212(c) relief based on a weighing of the above factors, viewing the merits of Castro's claim from the standpoint of an immigration judge sitting at the time of Castro's original deportation proceedings. At the hearing, Castro testified first, followed by the maternal grandmother of his children, his eldest daughter, his cousin, and his mother. The Government did not call any witnesses.

With respect to the adverse considerations, the Court first considers the exclusion ground at issue-Castro's 1994 conviction for selling narcotics. The Government is correct in noting that immigration judges were particularly cautious about granting § 212(c) waivers to aliens convicted of drug-related offenses. *See, e.g., Correa v. Thornburgh,* 901 F.2d 1166, 1170 (2d Cir.1990)(citing *Marin* and asserting that "[d]rug offenders must present a showing of unusual or outstanding countervailing equities to obtain a waiver, particularly if the grounds for exclusion involved trafficking in drugs"). It is also true, however, that courts in this circuit have found sufficient equities to establish prejudice in the cases of numerous drug offenders. *See, e.g., Perez,* 330 F.3d at 102 (upholding a district court's finding that there was a reasonable probability that an alien's significant family ties and history of steady employment in the United States would have outweighed his conviction for attempted sale of a controlled substance); *Calderon,* 391 F.3d at 376 (similarly affirming a holding by Judge Weinstein that an alien's positive equities, including his family ties and lengthy residence in the United States, most likely would have outweighed his conviction for possession of a controlled substance with intent to distribute). Moreover, the Court also notes that shortly before Castro's deportation hearings commenced, the BIA clarified its position on this issue: "In sum, this Board has never implemented, in law or in fact, a strict policy of denying section 212(c) relief to every alien convicted of a serious drug offense without regard to the totality of circumstances presented in the case. Our established practice has been, and continues to be, to premise discretionary determinations on the individual factors presented in a given case." *Matter of Burbano,* 20 I. & N. Dec. 872, 879 (BIA 1994). Castro's conviction for a single nonviolent drug offense, to be sure, would not have been fatal to his application for § 212(c) relief.

Quite to the contrary, immigration judges granted numerous § 212(c) waivers on the basis of countervailing equities in cases in which an alien had been convicted of multiple and/or violent offenses, some of which make Castro's crime look paltry in comparison. *See, e.g., Matter of Jose Jesus Gutierrez–Murillo,* No. A13 717 602, 6 Immig. Rptr. (MB) B1–72 (BIA 1988)(granting a § 212(c) waiver despite defendant's convictions for selling cocaine and for voluntary manslaughter); *Matter of Gordon,* 20 I. & N. Dec. 52, 53 (BIA 1989)(granting § 212(c) waiver despite defendant's lengthy criminal history including convictions for robbery and receiving stolen property); *Matter of Coelho,* 20 I. & N. Dec. 464, 468 (BIA 1992)(granting § 212(c) waiver despite defendant's multiple convictions for conspiracy to possess with intent to distribute cocaine and possession with intent to distribute cocaine); *cf. Scott,* 394 F.3d at 119–121 (finding that defendant would have had a reasonable probability of receiving a § 212(c) waiver despite a grand total of four convictions prior to his deportation hearings, including

two for criminal possession of stolen property, one for grand larceny, and one for unauthorized use of a vehicle); *Najera–Trejo*, 2006 WL 2191349 at *9–10 (also finding that defendant had a reasonable probability of receiving § 212(c) relief despite his plea of guilty on eight different charges stemming from a violent carjacking, including one count of robbery in the first degree).

Furthermore, despite the seriousness of Castro's conviction for selling a controlled substance,[10] Castro would have had a number of countervailing equities weighing in his favor. First, and most importantly, at the time of his deportation hearing and appeal, Castro had a substantial number of relatives living in the United States, including his mother, father, brother, several aunts and uncles, and numerous cousins. Tr. 3–4, 65–67. He also had three young daughters, all of whom were born in the United States and were citizens. By all accounts at the hearing, Castro enjoyed a close and loving relationship with his children prior to his incarceration, supporting them financially and taking on the role of primary caretaker as their mother's drug problem worsened. *Id.* at 9–11, 13–16, 47, 49–50, 53, 59, 63, 69, 72. Indeed, Castro's eldest daughter testified that she had only fond memories of her father from those days, stating that she remembered that "[h]e would dress us, bathe us, like a fa-

ther should do when [our mother] couldn't" and that "[h]e was there whenever I had to go to the emergency room [for severe asthma] ... I remember him always being the one there." *Id.* at 59. Considering the fact that it was certainly foreseeable at the time of Castro's deportation hearings that his deportation would leave his children without a stable parent, thus risking them becoming wards of the state, this is a very favorable consideration to which an immigration judge at the time surely would have given substantial weight.[11]

Other equities that would have weighed strongly in Castro's favor are his relatively lengthy legal residency in the United States, his steady work history and his efforts at rehabilitation. Castro testified that he had entered the United States in 1986 at the age of 21 as a lawful permanent resident. Tr. 4. At the time of his deportation proceedings, therefore, Castro had lived in the United States for approximately 10 years—about a third of his life. During this period, he had worked at a number of jobs to support himself and his family and appears to have been well-regarded by his employers. For example, a cousin for whom Castro had worked noted that he was always "responsible," "on time," "pleasant," and "had a very good attitude." *Id.* at 63. Moreover, although the evidence of Castro's rehabilitation after his conviction is somewhat limit-

---

10. The Court also notes that Castro would likely have had two other adverse factors weighing against him at the time of his deportation hearing, albeit much less determinative ones. During this Court's November 20, 2006 *Copeland* factual hearing, Castro conceded on cross examination that 1) he had struggled with a drug addiction during part of his time in the United States and that 2) he had not been diligent about filing income tax returns. Tr. 29–37. However, defendant also noted that he had recognized his addiction problem and sought help on several occasions for it. *Id.*

11. Although, as noted above, the Second Circuit warned courts in *Scott* not to consider *"ex post* data" that would not have been known at the time of a defendant's original deportation hearing, courts can, nevertheless, consider relevant future hardships that an immigration judge would have been able to easily foresee at the time a defendant was improperly denied his opportunity for § 212(c) relief. *United States v. Etienne*, 2005 WL 165384, at *8 n. 2 (D.Conn. Jan.14, 2005).

ed due to the short period between his arrest and his deportation, prison records reveal that Castro was not involved in any significant disciplinary incidents while incarcerated and had a good attitude towards staff and his fellow prisoners. Harris Aff., Ex. G. Castro also seems to have utilized his time in prison productively, participating in drug counseling programs, taking parenting and vocational courses, and pursuing his GED. *See, e.g.,* Tr. 17–18, 50.

In sum, recognizing that defendant's exclusion ground was serious, it is also clear that, at the time of his deportation hearing, he would have had unusual and outstanding equities weighing in his favor. Balancing the lone criminal conviction on his record, a serious but nonviolent one, with his many years of residency in the United States, a steady work history and, most importantly, three young citizen daughters whom he loved and had supported and whose risk for becoming wards of the state would have greatly increased upon their father's deportation, Castro could have made a powerful showing in favor of § 212(c) relief. Indeed, he could have made a much stronger showing than was made in numerous other cases where such relief had been granted.[12]

Accordingly, on the evidence presented at the *Copeland* hearing, this Court finds that there is a reasonable likelihood that Castro would have been granted relief un-

der § 212(c) by an immigration judge had a § 212(c) waiver request been presented on his behalf. In light of this finding, the Court holds that Castro has convincingly demonstrated he was prejudiced by the procedural errors which occurred at his deportation hearing and appeal, thus satisfying the third prong of 8 U.S.C. § 1326(d).

### III. CONCLUSION

Therefore, the Court finds that defendant Francisco Jose Castro has satisfied all three prongs of 8 U.S.C. § 1326(d) by establishing that he exhausted his administrative remedies, was denied his opportunity for judicial review, and that the entry of the deportation order against him was fundamentally unfair. As a result, the underlying deportation order violated his due process rights and cannot be the basis for the essential element of prior deportation which lies at the root of the pending illegal reentry charge. The Court must, consequently, grant defendant's motion. The indictment charging the defendant with illegal reentry in violation of 8 U.S.C. §§ 1326(a) and 1326(b)(2) is dismissed. The Clerk of the Court is directed to enter judgment in accordance with this opinion.

SO ORDERED.

---

12. The Court notes that its task in considering whether there is a reasonable probability that a defendant would have been granted § 212(c) relief is made particularly difficult by the fact that a large percentage of "section 212(c) [decisions are] unpublished and inaccessible," thus making it almost impossible for a court reviewing cases years later to identify patterns in who was granted relief and who was denied relief. *U.S. v. Copeland,* 369 F.Supp.2d 275, 305–08 (E.D.N.Y.2005)(decision on remand). This difficulty is compounded by the fact that

"[i]mmigration judges are human, subject to varying biases, and ... it is inevitable that some judges would have approached their evaluations with more sympathy and compassion than others." *Id.* at 310. Nevertheless, what *is* known is that following a weighing of the above factors, immigration judges were relatively generous in granting applications for § 212(c) relief—statistics indicate that "51.5% of the applications for which a final decision was reached between 1989 and 1995 were granted." *St. Cyr,* 533 U.S. at 296 n. 5, 121 S.Ct. 2271.